[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff has filed a Motion to Correct Arbitration Award and the defendant has filed a Motion to Confirm Arbitration Award.
This case arises out of an underinsured motorist claim brought by the plaintiff against State Farm Fire and Casualty Company (State Farm) for injuries sustained in an August 12, 1987 motor vehicle accident while the plaintiff was a passenger in a vehicle owned and operated by Chawon Bellamy of Richmond, Virginia. The tortfeasor vehicle was operated by Mark Whitehouse of Rockville, Connecticut, and owned by Sophie St. Martin of Enfield, Connecticut. The two-vehicle accident was investigated by the Stonington, Connecticut police. The plaintiff initially received outpatient treatment at the Westerly Rhode Island Hospital. He was transferred from there to the United States Naval Hospital at Groton, Connecticut, where he remained until August 18, 1987. The plaintiff is the named insured under two automobile liability policies issued by State Farm Fire Casualty Company.
The arbitration decision in issue is as follows:
 This matter came before the arbitration panel on March 27, 1991, when the parties were fully heard on the issues presented.
 The parties have briefed their respective claims of law and facts and have filed same with the arbitration panel on April 12, 1991.
 The parties have stipulated to the following facts:
 1. The liability for damages to the plaintiff is with the tortfeasor, Mark Whitehouse.
 2. The underinsured motorist coverage for the two State Farm Fire Casualty policies in effect on the date of this accident was $25,000 per person and $50,000 per accident. (See Claimant's Exhibit 3-C).
CT Page 10130
 3. A sum of $21,565.25 has heretofore been received from the Shelby Mutual policy insuring the tortfeasor which liability policy had a combined single limit of $50,000 in coverage.
 4. A sum of $3,434.75 has heretofore been received from the Allstate Insurance Company pursuant to the uninsured motorist coverage applicable to the vehicle in which the petitioner was a passenger with total coverage of $25,000 uninsured motorist insurance but with Allstate taking a credit for the Shelby tortfeasor payment in the amount of $21,565.25.
 As to specific issues :greed to by the parties, the decision of the arbitration panel is as follows:
ISSUE NO. 1:
 Should the law of Washington or the law of Rhode Island control to construe the terms of the two policies issued by State Farm Fire Casualty Company in covering the claimant on the date of the Accident?
 ARBITRATOR'S DECISION: The law of Rhode Island controls to construe the terms of both said policies.
ISSUE NO. 2:
 Under the law of Rhode Island, do the policies' terms include the definition of an underinsured motorist vehicle limit the claimants recovery to the extent that his damages must exceed in value $50,000 which constitutes the underlying limit of a tortfeasor's coverage?
ARBITRATOR'S DECISION: Yes.
ISSUE NO. 3:
Under the law of the State of Rhode CT Page 10131 Island, should stacking be permitted?
ARBITRATOR'S DECISION: Yes.
ISSUE NO. 4:
 Should Rhode Island's Prejudgment Interest Statute (R.I. Gen. Laws Sec. 9-21-10) be applied to any award rendered in this matter to assess interest at the rate of 12% per annum from the date the cause of action occurred (August 12, 1987)?
ARBITRATOR'S DECISION: No.
ISSUE NO. 5:
 Does Connecticut common law permit the panel to assess the legal rate on any award rendered on this matter and, if so, should this interest begin to accrue from the date of accident (August 12, 1987) or the date the claimant made demand on State Farm Fire Casualty Company for the policy limits (December 28, 1988)?
ARBITRATOR'S DECISION: No.
 The arbitration panel further finds that fair, just and reasonable damages to be received of the respondent by the petitioner is $72,000. The credit the respondent is to receive is in the amount of $50,000. The net recovery that the petitioner is to receive of the respondent is the sum of $22,000.
The Motion to Correct the Arbitration award challenges the arbitrator's decision on Issues Numbers 2, 4, and 5.
A. Standard of Review
The standard of judicial review of a compulsory arbitration proceeding, as stated in American Universal Insurance Company v. DelGreco, 205 Conn. 178, 191 (1987), is as follows:
Accordingly, we hold that, where CT Page 10132 judicial review of compulsory arbitration proceedings required by Sec. 38-175c(a)(1) is undertaken under General Statutes Sec. 52-418, the reviewing court must conduct a de novo review of the interpretation and application of the law by the arbitrators. The court is not bound by the limitations contractually placed on the extent of its review as in voluntary arbitration proceedings.
It is therefore necessary for the Court to conduct a de novo review of the interpretation and application of the law of Rhode Island by the arbitrators.
The claims raised by the plaintiff in his Motion to Correct Arbitration Award will be discussed seriatim.
I. THE PLAINTIFF'S CLAIM THAT THE ARBITRATORS ERRED IN HOLDING THAT UNDER THE LAW OF RHODE ISLAND, THE DEFINITION OF AN UNDERINSURED MOTORIST VEHICLE UNDER THE POLICIES ISSUED BY STATE FARM LIMITS THE PLAINTIFF'S RECOVERY TO THE EXTENT THAT HIS DAMAGES MUST EXCEED IN VALUE $50,000 WHICH CONSTITUTES THE UNDERLYING LIMIT OF THE TORTFEASOR'S COVERAGE.
The language contained in the policy issued to the claimant by State Farm defines an "underinsured motor vehicle" as
 1. a. land motor vehicle, the ownership, maintenance or use of which is:
 b. insured or bonded for bodily injury liability at the time of the accident; but
 (3) the limits of liability are less than the damages which the insured is legally entitled to recover.
The State Farm policy restricts the liability of State Farm as follows:
 6. The most we pay will be the lesser of:
 a. the difference between the amount of the insured's damages for bodily injury, and either:
(1) the sum of the limits of CT Page 10133 liability of all bodily injury liability bonds and insurance policies that apply to the insured's bodily injury, or
 b. the limits of liability of this coverage.
The Rhode Island underinsured motorist statute provides:
 For the purposes of this section "uninsured motorist" shall include an underinsured motorist. An underinsured motorist is the owner or operator of a motor vehicle who carries automobile liability insurance with coverage in an amount less than the limits or damages that persons insured pursuant to this section are legally entitled to recover because of bodily injury, sickness or disease, including death resulting therefrom.
R.I. Gen. Laws Sec. 27-7-2.1(B)(1) (emphasis added).
The parties are in agreement that the Rhode Island Supreme Court has never addressed the specific issue that is involved. A number of Rhode Island decisions are relevant in conducting a de novo review of the interpretation and application of the Rhode Island law by the arbitrators.
In Pickering v. American Employers Insurance Company, et al, 282 A.2d 584 (1971), the court was faced with the validity of an "excess-escape" clause in the "other insurance" section of an automobile insurance policy. The "excess-escape" clause provided that if the plaintiff is injured while occupying a vehicle not owned by her, the insurance provided in her policy shall apply only as excess insurance over other similar insurance available to her and then . . . "only in the amount by which the limit of liability for this coverage exceeds the applicable limit of liability of such other insurance." Pickering was decided prior to the amendment to the Rhode Island statute (Sec. 27-7-2.17) defining an uninsured to include an underinsured motorist which by definition compared the amount of liability insurance of the tortfeasor with the damages of the injured party. See Van Marter, infra.
In declining to give effect to the "other insurance" provision in question, the Pickering court stated at pages CT Page 10134 589-590 in part as follows:
 Our statute requires the insurance industry to make uninsured motorists coverage available in this state. It speaks of a "policy" and "protection" for those insured thereunder who are legally entitled to collect "damages" from the uninsured.
 The Legislature fixes a minimum, rather than a maximum, standard of protection. There is no ceiling upon the insured's right of recovery. We think it plain, as did the court in Patton, n. 6, that state legislatures were aware, as they enacted uninsured motorists legislation, that the insureds are often injured while in an automobile owned by someone other than them. Had our General Assembly intended to limit the recovery of an injured insured to one policy, even though such a person is covered by more than one policy, the Legislature would have so expressed itself. It is our belief that Sec. 27-7-2.1 is intended to protect an insured against his actual loss. Since the statute explicitly states without any equivocation whatever that each policy issued must supply the required minimum degree of protection, we cannot afford any recognition to the "excess-escape" clause of the subject policy. If we would do otherwise, we would subvert the purpose of the statute. We, therefore, affirm the trial justice's refusal to enforce the "excess-escape" clause of London's policy.
 Earlier, in Aldcroft v. Fidelity and Casualty Co., 106 R.I. 311, 259 A.2d 408, we refused to recognize a "Limits of Liability" clause which provided for a reduction in the damages payable under the uninsured motorists endorsement by the amount of workmen's compensation or such other similar disability benefits paid the insured. We said in Aldcroft that there is nothing in Sec. 27-7-2.1 which authorizes the issuance of a policy providing for protection in any lesser amount than that CT Page 10135 mandated by the statute. What was said in Aldcroft applies with equal force in the instant case. In joining those jurisdictions which have, in cases similar to this present appeal, declined to give effect to the "Other Insurance" provisions, we emphasize that our statute allows recovery of the full amount of the coverage so long as the amount of the recovery does not exceed the amount of the insured's actual loss. (emphasis provided).
In Poulos v. Aetna Casualty Security Co.,379 A.2d 362 (1977), the issue involved the validity of a provision in an automobile liability policy permitting a deduction from uninsured motorist coverage for workmen's compensation benefits. The Poulos court at pages 364-365 stated in part as follows:
 Deductions which allow the insurer to pay less than the amount fixed by the uninsured motorist statute have been allowed where the court has found the purpose of the statute is to provide protection, regardless of the source, only up to the statutory limit. Hackman v. American Mut. Liab. Ins. Co., 110 N.H. 87, 90, 261 A.2d 433, 436 (1970). Such deductions have also been allowed by some courts which find that the legislative purpose is to place the injured policyholder in the same position he would have been if the tortfeasor had carried liability insurance; they reason that allowing the deduction best accomplishes this purpose, since injured motorists who recover from insured motorists are required by workmen's compensation statutes to repay the compensation carrier.
 However, unlike the Hackman court, this court has found that Sec. 27-7-2.1 does not establish a maximum standard of protection. "There is no ceiling upon the insured's right of recovery." Pickering v. American Employers Ins. Co., supra, 109 R.I. at 152, 282 A.2d at 590. Moreover, this court has not interpreted the purpose CT Page 10136 of the uninsured motorist statute as an attempt to equate the position of one who recovers from his own insurance company with the position of one who recovers liability insurance from the tortfeasor's insurance company. In the Pickering case we pointed out that "(u)ninsured motorists insurance is not liability insurance." Id. at 147, 282 A.2d at 587. It is a compensation policy intended to protect the insured against his actual losses. Id. at 152, 282 A.2d at 590.
 We are of the opinion that the public policies of protection for actual losses of the insured and prevention of double recovery require an interpretation of the clause to allow the deduction of workmen's compensation benefits only to the extent that such benefits represent a double recovery. . . . Thus we hold that the deduction clause entitles the defendant to deduct workmen's compensation benefits from the insured's total damages rather than from the face value of the policy. (emphasis provided.)
In Employers' Fire Ins. Co. v. Baker, 383 A.2d 1005
(1978), the issue of the enforceability of a so-called excess-escape clause was again involved.
The Employers' court stated at page 1009 in part as follows:
 II. The second issue raised involves the construction to be given to the conflicting "other insurance" provisions in the uninsured motorist coverage clauses of the applicable policies, those issued by Employers and American. Baker has sustained a loss covered by two insurers. In anticipation of such situations, most policies contain "other insurance" clauses which purport to limit or avoid liability where other valid and collectible insurance covers the same loss.
In general there are four types of CT Page 10137 "other insurance" clauses used. These are (1) the pro rata clause which provides that the insurer will pay its share of the loss in the proportion its policy limits relates to the aggregate liability coverage available; (2) the "excess" clause which provides that the insurer's liability is limited to that amount of the loss exceeding the limits of other available insurance; (3) the "escape" clause which provides that the insurer is not liable if other coverage is available; and (4) the "excess-escape" clause which provides that the insurer's liability is limited to that amount of the loss exceeding the limits of other available insurance and that the insurer is not liable when the other available insurance contains limits equal to or in excess of its own limits. The clauses relied on by both American and Employers are of the "excess-escape" type.
 This court has found the "excess-escape" clause as it applies to uninsured motorist coverage of automobile liability policies repugnant to Sec. 27-7-2.1 and therefore unenforceable. Pickering v. American Employers Insurance Co., 109 R.I. 143, 282 A.2d 584 (1971). The limitation which such a clause places on the recovery of an insured injured by an uninsured motorist is contrary to the intent of the statute to protect the insured against his actual loss; the statute unequivocally states, as we have held before, that "each policy issued must supply the required minimum degree of protection." Id. at 152-53, 282 A.2d at 590. Thus the insured may recover the full amount of each uninsured motorist coverage to which he or she is entitled as long as recovery does not exceed the insured's actual loss. (emphasis provided).
 5. See Conflicts Between "Other Insurance" Clauses in Automobile Liability Insurance Policies, 20 Hasings L.J. 1292 (1969). See p. 3, supra, for the full text of the Employers and American clauses.
CT Page 10138
The reference in footnote 5 in Employers' to page 3 of the 30 Hastings Law Journal refers to the following:
 The purpose of the escape clause is to avoid all liability when a double insurance situation exists. When effective, the clause gives the insurer a windfall in that premiums are collected from the insured, and yet no liability is incurred when other insurance covers the same loss.
 A second type of clause frequently used in automobile liability policies is the excess clause. One version of the excess clause attempts to limit the insurer's liability to that amount of the insured's loss which exceeds the policy limits of the other insurer.
 If there is other insurance against an occurrence covered by this policy, this insurance shall be deemed excess insurance over and above the applicable limits of such other insurance.
 A somewhat different result is brought about by another version, the limited excess clause.
 (T)he insurance hereunder shall apply only as excess insurance over any similar insurance available to the (insured), and this insurance shall then apply only in the amount by which the applicable limit of liability of this endorsement exceeds the sum of the applicable limit of liability of all such other insurance.
 With this clause, the insurer limits its liability to the difference between its policy limits and the sum of the policy limits of all other insurance covering the loss. To illustrate, suppose the applicable policy limit of the insurer's policy with the limited excess clause was $25,000 and there were two other collectible policies with limits of $10,000 and $12,000. The insurer with the CT Page 10139 limited excess clause becomes a complete escape clause if the total amount of other insurance equals or exceeds the policy limits of this particular policy.
In this case, the clause relied upon by State Farm restricts its liability to the difference between the amount of the insured's damages for bodily injury ($72,000) and the sum of the limits of liability of all other bodily injury liability insurance policies that apply to the insured's bodily injury ($50,000 on the tortfeasor vehicle). This excess clause in the State Farm policy becomes a complete escape clause if the total amount of other insurance on the tortfeasor vehicle equals or exceeds the amount of the insured's damages for bodily injury. Thus if the Shelby Mutual policy covering the tortfeasor had been in the amount of $72,000 or more, there would have been no difference between the amount of the plaintiff's damages for bodily injury and the limit of liability on the tortfeasor policy in which case the excess clause of State Farm would have become an escape clause.
The court in VanMarter v. Royal Indemnity Co.,556 A.2d 41 (1989), reviewed the statutory amendment expanding the definition of "uninsured motorist" to include an underinsured motorist when it stated in part at pages 43-44 as follows:
 As insurance policies provide for uninsured motorist coverage, it must be considered who is an uninsured motorist. Prior to its June 25, 1985 amendment, Sec. 27-7-2.1 contained the term "owners or operators of uninsured motor vehicles," but did not expressly define the term. Section 27-7-2.1, as amended by P.L. 1981, ch. 251, Sec. 2. The term "owners or operators of uninsured motor vehicles" or "uninsured motorist" was interpreted to have two definitions. The first definition was a plain meaning interpretation that an uninsured motorist is a motorist without liability insurance. Allstate Ins. Co. v. Fusco, 101 R.I. 350, 356, 223 A.2d 447, 451 (1966). The second definition was a motorist who at the time of the accident was not covered by a liability policy in the minimum amounts mandated by Sec. 31-31-7. Ziegelmayer v. Allstate Ins. Co., 121 R.I. at 821, 403 A.2d at 655; Allstate Ins. Co. v. Fusco, 101 R.I. at 357, 223
CT Page 10140 A.2d at 451. Under the second definition, an uninsured motorist could be a motorist with liability insurance, but the coverage of such insurance was in an amount less than that required by Sec. 31-31-7. An uninsured motorist could fit either of the above two descriptions.
 On June 25, 1985, Sec. 27-7-2.1 was amended and the following definition added:
 "(B) * * * `uninsured motorist' shall include an underinsured motorist. An underinsured motorist is the owner or operator of a motor vehicle who carries automobile liability insurance * * * in an amount less than the * * * damages that persons injured pursuant to this section are legally entitled to recover because of bodily injury * * *." P. 6. 1985, ch. 197, Sec. 1.
 This amendment expands the definition of uninsured motorist to add a third definition. The third definition is that an uninsured motorist is any motorist whose liability insurance is less than the damages recoverable by a tort victim. Under this definition, a motorist may have liability insurance in the statutorily required amount, but still be an uninsured motorist if a tort victim's damages are over such amount. With the addition of the June 25, 1985 amendment, there are three types of uninsured motorists under Sec. 27-7-2.1. The three types are first, a motorist without liability insurance, second, a motorist with liability insurance in amounts less than those prescribed by Sec. 31-31-7, and third, a motorist with liability insurance in at least those amounts prescribed by Sec. 31-31-7, but these amounts do not fully compensate the tort victim. In cases where the June 25, 1985 amendment is applicable, an uninsured motorist could fit any of these three descriptions.
In cases where insurance policies do CT Page 10141 not conform to the statutory requirements, the language of the policy will be disregarded and the contract will be construed to conform to the statute. Aldcroft v. Fidelity Casualty Co., 106 R.I. 311, 318, 259 A.2d 408, 413 (1969); Allstate Ins. Co. v. Fusco, 101 R.I. at 356, 223 A.2d at 450. As regards the definition of an uninsured motorist, the terms of an insurance policy defining uninsured motorist will be construed to conform to a minimum of the statutory definition. (emphasis provided.)
The last relevant case is Aetna Casualty Surety Co. v. Graziano, 587 A.2d 916 (1991), where the court was faced with an automobile policy provision setting off any recovery that one might have under the uninsured motorist section of the policy by the amount that had been collected under the liability section of the same policy.
The Aetna court stated in part as follows on pages 918-919:
 n. 1 — The defendants claim that the 1985 amendment, P.L. 1985, ch. 197, Sec. 1 (enacted on June 25, 1985) is applicable in this case since Michael's policy was issued or renewed on April 21, 1986. The plaintiffs maintain that the 1986 amendment (enacted one month prior to the accident) may be applied back to the date of renewal since it merely codifies a preexisting legislative intent. The 1986 amendment, P.L. 1986, ch. 334, Sec. 1, defines an "underinsured motorist" as "(t)he owner or operator of a motor vehicle who carries automobile liability insurance with coverage in an amount less than the limits that persons injured pursuant to this section are legally entitled to recover because of bodily injury, sickness or disease, including death resulting therefrom." Although plaintiff's argument is interesting, adherence to the 1986 statute rather than to the 1985 statute would not alter our decision. In this opinion, we shall apply the 1985 statute.
CT Page 10142
 The trial justice indicated in his decision that "(t)here is no question that if there was a two vehicle accident and Paul (Graziano) were to recover a hundred thousand dollars from the liability carrier of the other operator, that he would be covered and be entitled for coverage C claim of up to a hundred thousand dollars in order to make him whole under the Aetna's policy."
 In DiTata v. Aetna Casualty Surety Co., 542 A.2d 245, 247 (R.I. 1988), this court specifically stated:
 "The statute requires insurance carriers to provide protection for those claimants who voluntarily contract with licensed carriers for liability coverage as against uninsured operators. (Citing Allstate Insurance Co. v. Fusco, 101 R.I. 350, 356, 223 A.2d 447, 450 (1966).) It thus protects those who have attempted to protect the public interest and themselves by purchasing insurance."
 Applying this rule to the instant case, defendants would be justified in applying for the underinsured motorist coverage provided by their own individual insurance policies since the liability provision of the tortfeasor, Michael, did not fully satisfy their damages.
 The primary purpose of the statute was to protect the named insured from uninsured tortfeasors, and its intention is not circumvented by denying underinsured motorist benefits to anyone, including the named insured, who has already recovered under the liability provisions of the same policy. Id. at 553. Clear and unambiguous set-off provisions are valid attempts by the insurance companies to avoid claims for double recovery, which could result in prohibitive costs for insurance carriers as well as for those paying premiums, and as such are not contrary to public policy. (emphasis provided.)
CT Page 10143
In arguing that the Court should confirm the arbitrator's decision that the claimant may recovery only to the extent that his damages exceed the $50,000 limits of the tortfeasor's liability coverage, State Farm argues in part as follows:
 As can be seen by the above-quoted policy and statutory language, both the State Farm policy and Rhode Island law limit the obligations of an underinsured motorist carrier by comparing the difference between the amount of available liability coverage to the amount of the claimant's damages. The fact that this liability coverage/damages comparison found in the policy definition of an underinsured motor vehicle virtually mirrors the statutory description, compels the conclusion that the policy's limitations on the carrier's payment obligations fully comport with both the letter and spirit of Rhode Island law.
 In fact, the Rhode Island Supreme Court has consistently held that "in the absence of a statutorily declared policy to the contra, the parties to an insurance agreement are free to contract as they desire." Constant v. Amica Mutual Ins. Co., 497 A.2d 343, 345 (R.I. 1985); see also Faraj v. Allstate Ins. Co., 486 A.2d 582 586 (R.I. 1984) (copies attached). Where the legislature has expressed no objection to the particular type of contractual protection, the insurer is entitled to limit its liability to the claimants, even where it may result in the claimants not being fully recompensed for their injuries. Under such circumstances, the insurer "does not bear the responsibility of making them whole." DiTata v. Aetna Casualty Surety Co., 542 A.2d 245, 248 (R.I. 1988) (copy attached).
 In sum, Rhode Island, like other jurisdictions, obligates insurance carriers to issue policies whose provisions conform to statutory requirements. VanMarter v. Royal CT Page 10144 Indemnity Co., 556 A.2d 41, 44 (R.I. 1989) (copy attached). The State Farm policy definition of an underinsured motorist and the subsequent limitations on its obligations conform precisely with the statutory scheme articulated in Section 27-7-2.1(B)(1) of the Rhode Island General Statutes. Rhode Island courts have yet to find either this statutory provision or the policy language contained in the State Farm insurance contract to be abhorrent to Rhode Island public policy. Absent a statutorily articulated public policy that invalidates these insurance provisions, the limitations of liability contained in the State Farm policy remain valid. As such, the claimant can recover only to the extent that his damages exceed the $50,000 liability limit of the Shelby Mutual policy.
The Court is not persuaded by that argument.
The issue involved in Constant had to do with the validity of a clause in an insurance policy prohibiting intra-policy stacking. Constant was decided prior to the amendment to section 27-7-2.1 that currently specifically allows for stacking. In upholding the prohibition against intra-policy stacking, the Constant court held in part that:
 We have recently held that in the absence of a statutorily declared policy to the contra, the parties to an insurance agreement are free to contract as they desire.
Constant did not involve an attempt to reduce the statutorily mandated amount of uninsured motorist coverage below the minimum required by the use of an excess or an escape clause. State Farm also relies on Faraj, supra. In clause in an automobile liability policy excluding family members from coverage. The Faraj court, relying on the language of section 27-7-1, held that nothing in the Rhode Island statute purported to define the scope of coverage in an automobile liability policy or the persons who shall be excluded within the scope of such coverage. The Faraj court, therefore, held that the exclusion in question was valid. Faraj did not involve an attempt to reduce the statutorily mandated amount of uninsured motorist coverage below the minimum required, by the use of an excess or escape clause. CT Page 10145
The Faraj and Constant decisions did not invoke excess/escape reduction in coverage clauses.
The respondent also relies on DiTata, supra, for the proposition that the insurer "does not bear the responsibility of making them whole." The issue involved in DiTata was whether the insurer was entitled to limit its payments of medical benefits to insureds to uninsured motorist coverage as long as it provided statutorily minimum recovery of $50,000 under uninsured motorist coverage.
(In view of the fact that the parties stipulated in this case that each of the two State Farm insurance policies only provided uninsured motorist coverage of $25,000 per policy, this Court expresses no opinion as to whether those policies conformed to the amended Rhode Island statutorily mandated minimum limits of $50,000 for each policy.) The DiTata court in upholding the medical provision that reduced payments of medical coverage by any amounts paid or payable for the same expenses under the uninsured motorist coverage of the same policy, at page 248, stated in part as follows:
 Analyzing the insurer and the insured's relationship in light of statutory law, we determine that at the time of this action, the Legislature had expressed no objection to this type of contractual protection. We hold, therefore, that the insurer was entitled to limit its payment to the plaintiff's to the uninsured-motorist coverage because it provided the statutory minimum recovery of $50,000. (emphasis provided)
DiTata does not simply stand for the proposition that an insurer does not bear the responsibility of making the insured whole. It stands for the proposition that as long as the insurer pays out the mandatory statutory amount of uninsured motorist coverage, it has the right to limit other types of coverage payments such as medical payments. The purpose of the underinsured motorist statute in Rhode Island is to require insurance carriers to provide protection for those claimants who voluntarily contract with licensed carriers for liability coverage as against uninsured operators. DiTata, supra. In cases where insurance policies do not conform to the statutory requirements, the language of the policy will be disregarded and the contract will be construed to conform to the statute. VanMarter, supra. The underinsured motorist statute in Rhode Island, mandates a minimum degree of CT Page 10146 protection. Pickering, supra. The Rhode Island statute allows recovery of the full amount of the coverage as long as the amount of the coverage does not exceed the amount of the insured's actual loss. Pickering, supra. This Court concludes that the excess-escape clause in the policies issued by State Farm would subvert the Rhode Island requirement that each policy supply the required minimum degree of protection. The one common thread running through the Rhode Island decisions involving attempts by the insurer to reduce the full amount of uninsured motorist coverage is that the Rhode Island statute allows recovery of the full amount of uninsured motorist coverage as long as the amount does not exceed the amount of the insured's loss. The uninsured motorist insurance is compensation intended to protect the insured from his actual losses. The $25,000 recovered by the plaintiff from Shelby Mutual and Allstate entitled State Farm to deduct that amount from the $72,000 total damages of the plaintiff. The "excess-escape" clause of the State Farm policy reducing the amount of uninsured motorist coverage it will pay to the difference between the plaintiff's damages ($72,000) and the limits of applicable bodily injury insurance policies ($50,000 Shelby Mutual policy) is repugnant to section 27-7-2.1 and therefore unenforceable.
The arbitrator's decision is corrected to provide that the net recovery that the plaintiff is to receive of the defendant is the sum of $47,000.
II. THE PLAINTIFF'S CLAIM THAT THE ARBITRATORS ERRED IN HOLDING THAT THE RHODE ISLAND PREJUDGMENT INTEREST STATUTE SHOULD NOT BE APPLIED TO ANY AWARD RENDERED IN THIS MATTER TO ASSESS INTEREST AT THE RATE OF 12 PERCENT PER ANNUM FROM THE DATE THE CAUSE OF ACTION OCCURRED (AUGUST 12, 1987).
In support of that claim, the plaintiff argues in part as follows:
 He was entitled, by contract, to all of the benefits of Rhode Island law, including the benefit of Rhode Island's prejudgment interest statute. See: Paola v. Commercial Union Assurance Co., 461 A.2d 935 (R.I. 1983).
The Court is not persuaded by that argument.
Under Rhode Island law, interest is an integral part of damages and not an item of expense or cost. Factory Mutual Liability Insurance Co. of America v. Cooper, 106 R.I. 632,262 A.2d 370 (1970); Lombardi v. Merchants Mut. Ins. Co., CT Page 10147429 A.2d 1290, 1293 (1981). There is no indication in the Paola decision relied upon by the plaintiff that the motor vehicle accident in question occurred outside the State of Rhode Island. In Berardi, U.S.A. v. Employers Mutual Casualty Co.,526 A.2d 515 (1987), the issue was whether to apply New York law or Rhode Island law in an action brought in Rhode Island to recover uninsured motorist benefits arising out of an accident that occurred in New York. The Berardi court, at pages 516-517, stated in part as follows:
 It is undisputed that New York law would control an action between plaintiffs and Irwin to recover for personal injuries arising out of the accident. In determining which law governs a tort action involving two or more jurisdictions, Rhode Island applies the "interest-weighing approach." Brown v. Church of the Holy Name of Jesus, 105 R.I. 322, 326-27, 252 A.2d 176, 179 (1969). Accordingly, the court considers numerous factors which include the place of injury; the place where the tortious conduct occurred; the domicile, residence, and place of business of the parties; and the place where the relationship, if any, between the parties was centered. Id. Applying these factors to the action between plaintiffs and Irwin, we find that the tortious acts and injury occurred in New York; Betty Irwin was a resident of New York; and evidence in the case would be more accessible in New York. For these reasons New York would have the more significant interest in an action between plaintiffs and Irwin and New York law would be applied.
In applying the Rhode Island "interest-weighing approach," including (1) the place where the tortious conduct occurred (Connecticut); (2) the domicile, residence, and place of business of the parties (the tortfeasor operator was from Connecticut, the owner of the tortfeasor vehicle was from Connecticut, the operator of the vehicle in which the plaintiff was a passenger was from Virginia, and the plaintiff resided in Rhode Island); and (3) the place where the relationship, if any, between the parties was centered.
Further, evidence in this case was more accessible in Connecticut for the reason that the motor vehicle accident CT Page 10148 was investigated by the Stonington, Connecticut police force and most of the treatment that the plaintiff received for his injuries occurred at the Naval Submarine Hospital in Groton, Connecticut. For these reasons, Connecticut would have the more significant interest in an action between the plaintiff and State Farm and Connecticut law would be applied and not the Rhode Island prejudgment interest statute.
III. THE PLAINTIFF'S CLAIM THAT THE ARBITRATOR'S ERRED IN HOLDING THAT CONNECTICUT COMMON LAW DOES NOT PERMIT THE PANEL TO ASSESS THE LEGAL RATE ON ANY AWARD RENDERED ON THIS MATTER.
In support of this claim, the plaintiff argues in part as follows:
 In other words, the company knew that Rhode Island law ought to apply to the stacking question and knew, or should have known, that Rhode Island law allowed stacking. They denied coverage totally. By doing so, they had use of the money throughout the course of this litigation. See Chmielewski v. Aetna Casualty Co., 218 Conn. 646 (1991) at page 676. There was aggregious bad faith on the part of the company, and this bad faith was pointed out to the arbitrators. (See Claimant's Supplemental Memorandum dated April 12, 1991 (last page)).
 The panel erred by failing to award interest pursuant to Connecticut law.
The Court is not persuaded by that argument.
In Middlesex Mutual Assurance Co. v. Walsh,218 Conn. 681, 701 (1991), in addressing the issue of prejudgment interests on an arbitration award, the court stated in part as follows:
 Section 37-3a provides, with certain exceptions inapplicable here, that interest "may be recovered and allowed in . . . arbitration proceedings under chapter 909. . . as damages for the detention of money after it becomes payable. . . ." The proceeding commenced by Middlesex to vacate the arbitration award under General Statutes Section 52-418, a provision CT Page 10149 contained in chapter 909 of the General Statutes, is unquestionably one in which the legislature intended that prejudgment interest might be recovered. In accordance with the permissive language of Section 37-3a; see White Oak Corporation v. Department of Transportation, 217 Conn. 281, 302, 585 A.2d 1199 (1991); we have stated that "`(t)he allowance of interest as an element of damages is primarily an equitable determination and a matter within the discretion of the trial court.'" Metcalfe v. Talarski, 213 Conn. 145, 160 567 A.2d 1148 (1989); Nor'easter Group, Inc. v. Colossale Concrete, Inc., 207 Conn. 468, 482, 542 A.2d 692 (1988). While the determination depends in part upon when the money involved is "payable;" see General Statutes Section 37-3a; see also White Oak Corporation v. Department of Transportation, supra; "(t)he real question in each case is whether the detention of the money is or is not wrongful under the circumstances." Cecio Bros., Inc. v. Feldmann, 161 Conn. 265, 275, 287 A.2d 374 (1971); see Associated Catalog Merchandisers, Inc. v. Chagnon, 210 Conn. 734, 748, 557 A.2d 525 (1989); Newington v. General Sanitation Service Co., 196 Conn. 81, 90, 491 A.2d 363
(1985). The determination "`is one to be made in view of the demands of justice rather than through the application of any arbitrary rule.'" Cecio Bros., Inc. v. Feldmann, supra; Bernhard v. Rochester German Ins. Co., 79 Conn. 388, 398, 65 A. 134 (1906).
Further, in also discussing the issue of prejudgment interest on an arbitration award, the court in Chmielewski v. Aetna Casualty Surety Co., 218 Conn. 646, 675-676 (1991), stated in part as follows:
 The defendant next claims that the trial court abused its discretion in awarding interest on the award to the plaintiff retroactive to the date of the award. The defendant argues that "since the arbitration award was excessive, the defendant clearly acted prudently in CT Page 10150 refusing to pay" it and, therefore, the defendant's detention of the money could not have been wrongful. We are unpersuaded.
 We have today decided that a trial court has discretion, under General Statutes Section 37-3a, to award prejudgment interest on an arbitration award retroactively to some date prior to the date of the trial court's judgment affirming the award. Middlesex Mutual Assurance Co. v. Walsh, 218 Conn. 681, 701, ___ A.2d (1991). Implicit in that determination is the conclusion that the prior date may be the date of the arbitration award. We also reasserted the well established propositions that Section 37-3a provides for interest on money detained after it becomes due and payable, that the question under that statute is whether the money was wrongfully withheld, and that the ultimate determination "`is one to be made in view of the demands of justice rather than through the application of any arbitrary rule.'" Id., 702, quoting Cecio Bros., Inc. v. Feldmann, 161 Conn. 265, 275, 287 A.2d 374 (1971). It is equally well established that we will not overrule the trial court's award of interest absent a clear abuse of discretion. Metcalfe v. Talarski, 213 Conn. 145, 160, 567 A.2d 1148 (1989).
While the claim of the plaintiff in this matter arises out of an uninsured motorist provision of an insurance contract, the underlying claim arises out of a claim for damages for personal injury. There is no basis under Connecticut common law to assess interest on an arbitration award arising out of an uninsured motorist claim for personal injuries. The basis for an allowance for interest on an arbitration award is statutory under the provisions of Section 37-3a. In exercising the discretion to award interest in this matter as an element of damages, this Court concludes that the money owed by the defendant to the plaintiff became payable as of the date of the arbitration award, namely, May 9, 1991. Accordingly, the defendant is ordered to pay to the plaintiff interest on the $47,000 owed by the defendant to the plaintiff at the Connecticut legal rate of interest retroactive to CT Page 10151 May 9, 1991.
It therefore follows that the plaintiff's Motion to Correct is granted to the extent of increasing the award from $22,000 to $47,000. Further, interest on the award is allowed retroactive to May 9, 1991. The defendant's Motion to Confirm Arbitration Award is denied.
AXELROD, J.